# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**SONIA DRUDGE,**

**Plaintiff,**

**-vs-**                                          **Case No.  6:07-cv-452-Orl-28GJK**

**CITY OF KISSIMMEE and NORMAN LANPHERE,**

**Defendants.**

_____

# ORDER

In May 2003, the Kissimmee Police Department ("KPD") presented an arrest affidavit to a state court judge and obtained a warrant for the arrest of Plaintiff, Sonia Drudge ("Ms. Drudge"), for failure to report suspected child abuse, a first-degree misdemeanor under Florida law.  A few weeks later, the state attorney's office filed an information charging Ms. Drudge with that offense.  In April 2004, however, a county judge dismissed the charge upon concluding that the Florida statute under which Ms. Drudge was charged did not apply to the circumstances of the case.

After the criminal case against her was dismissed, Ms. Drudge filed this lawsuit[1] seeking damages against the City of Kissimmee ("the City") and three of its police officers, contending that her arrest was in violation of the United States Constitution and state law. Ms. Drudge has voluntarily dismissed her claims against two of the police officers, leaving

_____

[1]This case was initially filed in state court on February 13, 2007.  (Compl., Doc. 4). Defendants removed the suit to this Court on March 13, 2007.  (Notice of Removal, Doc. 1).

Sergeant Norman Lanphere[2] and the City as the remaining Defendants.  This cause is currently before me on the motions for summary judgment (Docs. 41 & 44) filed by the Defendants.[3]  Ms. Drudge has filed memoranda in response to the motions (Docs. 52 & 54), and Defendants, with permission of the Court, have filed replies (Docs. 61 & 62) thereto. Having considered the parties' submissions and pertinent law, I conclude that Defendants' motions must be granted as to all of Ms. Drudge's remaining claims.

I. Background

On Monday, May 12, 2003, the father of a second-grader at Kissimmee Elementary School made a complaint to the principal, Dr. Kenneth Meyers, about a game that his daughter's teacher, Matthew Rossillo, had been playing with his daughter and some other students.  (Meyers Dep. at 26-30).  The father told Dr. Meyers that he liked Mr. Rossillo and did not want to get him in trouble, but the father wanted the game to stop.  (Id. at 28).  The game involved Mr. Rossillo instructing each student to close her eyes, hold Mr. Rossillo's fingers, and guess how many fingers she was holding.  (Id. at 28-29).

Dr. Meyers talked to two of the students, and they confirmed that this game had taken place after school while they were waiting to be picked up.  (Id. at 31-32).  One of the girls

---

[2]Sergeant Lanphere changed his last name to Envall in 2005.  (Lanphere Aff., Attach. to Doc. 43, ¶ 1).  For consistency, he shall be referred to throughout this Order as Lanphere even though some of the filings in the record refer to him as Envall.

[3]The City's motion (Doc. 44) was filed on behalf of both the City and KPD Deputy Chief John Klein.  Ms. Drudge has since voluntarily dismissed the claims against Defendant Klein.  (See Docs. 53 & 57).  Thus, the motion is moot insofar as it pertains to Defendant Klein and shall be denied as such in that regard.

used the term "wiener" in describing the game (id. at 32), and one said she heard a sound like a zipper during the game (id. at 33).   After interviewing these two students, at approximately 2:00 p.m. that day Dr. Meyers called the Osceola County Human Resources ("HR") Department and told Lissa Bobet, the Director of HR, that he had received a complaint from a parent about Mr. Rossillo that involved a game being played after dismissal that the father thought seemed unconventional.  (Id. at 33-34; Bobet Dep. at 11, 18-19).[4]

In accordance with the procedure that she had been trained to follow, Ms. Bobet notified the associate superintendent of school operations, who directed Ms. Bobet to gather more information regarding the parent's complaint.  (Bobet Dep. at 28-30).   Pursuant to instructions from the associate superintendent, Ms. Bobet told Dr. Meyers to send Mr. Rossillo to the media center—at the district office, not at the elementary school—while the investigation was being conducted.  (Id. at 34-35; see also Meyers Dep. at 37-38).[5]   The associate superintendent also asked that Dr. Meyers and Student Services investigate the complaint.  (Bobet Dep. at 34).  Ms. Bobet then advised Ms. Drudge, who worked in Student Services as a School Relations Specialist, of the complaint and asked her to investigate it. (Id. at 38-40).

Ms. Drudge first learned of the complaint on Tuesday, May 13th, when Ms. Bobet

---

[4]Dr. Meyers and Ms. Bobet testified in their depositions that during the initial call, Dr. Meyers did not tell Ms. Bobet that he suspected that the game Mr. Rossillo had been playing involved sexual abuse.  (Bobet Dep. at 31; see also Meyers Dep. at 34-36).

[5]Dr. Meyers did not contact anyone else that day about the matter except to notify the parents of the identified students regarding a concern about Mr. Rossillo and that Mr. Rossillo had been removed from the classroom.  (Meyers Dep. at 37-38).

contacted her about it.  (Drudge Dep.[6] at 39-40, 52-53).  Initially, Ms. Drudge did not know specifically what allegation had been made against Mr. Rossillo; Ms. Bobet did not tell her that there was issue regarding potential sexual abuse.  (Id. at 53-54).  Ms. Drudge then spoke to Dr. Meyers on the phone, and he told her a parent had come to him with some questions about a game that Mr. Rossillo was playing with the students; Dr. Meyers did not describe the game more specifically.  (Id. at 54-55).

Ms. Drudge went to the school, arriving sometime after noon on Tuesday, May 13th.  (Id. at 55).  Dr. Meyers gave Ms. Drudge the names of the students alleged to be involved in the game, and Ms. Drudge began interviewing them at the school.  (Id. at 58-59).  The first student that Ms. Drudge interviewed told her that during the game, Mr. Rossillo sat in his desk chair and asked her to stand with her back to him; he then would place different fingers in her hand and ask her to guess how many fingers he had placed there.  (Id. at 60).  The student stated that it did not feel like fingers.  (Id.).  This student did not use the word "penis," but Ms. Drudge does not recall whether she used the word "wiener."  (Id.).  In any event, this student's statements caused Ms. Drudge concern and prompted her to continue asking questions to ascertain what was involved in the game.  (Id. at 61).  After this first interview, Ms. Drudge told Ms. Bobet what this child had said and that she was concerned; Ms. Bobet instructed her to continue interviewing the children who had already been named.  (Id. at 67, 69; see also Bobet Dep. at 44-45).

---

[6]There are two depositions of Ms. Drudge in the record – one taken on July 23, 2007 and one taken on September 7, 2007.  All citations to Ms. Drudge's deposition in this Order are to the July 23, 2007 deposition.

Ms. Drudge interviewed two more students on Tuesday, one of whom did not claim that anything other than fingers were ever placed in her hand and one of whom did, using the word "wiener." (Drudge Dep. at 62-65). This statement concerned Ms. Drudge. (Id. at 66). By then, the school dismissal bell had rung for the day, and when Ms. Drudge tried to reach Ms. Bobet by telephone afterward, Ms. Bobet's secretary informed her that Ms. Bobet had already left her office for the day. (Id. at 67, 73). As she left the Kissimmee Elementary campus that afternoon, Ms. Drudge asked Dr. Meyers to contact the parent who had made the initial complaint to have him bring his child—who had been absent from school on both Monday and Tuesday—-to school the following day so that Ms. Drudge could speak with her. (Id. at 67).

On Wednesday, May 14th, Ms. Drudge arrived at the school at around 8:00 a.m. and spoke to the child of the parent who had initially complained. (Id. at 67, 79). This child told Ms. Drudge that she had played the game with Mr. Rossillo and was suspicious about what Mr. Rossillo was putting in her hand, using the word "wiener." (Id. at 79-80). This child also said she might have felt Mr. Rossillo's zipper. (Id. at 81).

When Ms. Drudge finished interviewing this fourth child, several of the parents of the children involved were waiting for Ms. Drudge at the office and she met with each of them individually. (Id. at 83). These meetings took the rest of the day, and at the end of the day she spoke to Dr. Meyers and his assistant principal. (Id. at 85). Together, they called Ms. Bobet on the phone, and Ms. Bobet told Ms. Drudge to report to Ms. Bobet's office immediately so that they could meet with the superintendent. (Id.). Ms. Drudge arrived at Ms. Bobet's office at around 4:00 p.m. on Wednesday, May 14th; together, they walked over

to the superintendent's office and informed him of Ms. Drudge's findings.  (Id. at 85-86).  The superintendent was very upset and asked Ms. Drudge and Ms. Bobet to immediately contact law enforcement.  (Id. at 86; see also Bobet Dep. at 59-60).

By then, it was after 4:30 p.m. on Wednesday, May 14th.  (Drudge Dep. at 87).  Ms. Drudge and Ms. Bobet walked back to Ms. Bobet's office, and Ms. Bobet called Deputy Derek Harvey of the Osceola County Sheriff's Office.  (Id. at 87-88; Bobet Dep. at 68-69). In Ms. Drudge's presence, Ms. Bobet told Detective Harvey that she had a case involving allegations of inappropriate behavior by a teacher towards children at Kissimmee Elementary School (Drudge Dep. at 88-89; Bobet Dep. at 80).  Upon receipt of the report, Detective Harvey told Ms. Bobet that the school was not in the jurisdiction of the sheriff's office and she would need to report the matter to the school resource officer.  (Bobet Dep. at 80-81). Accordingly, Ms. Bobet began trying to reach Dr. Meyers, and as she did so Ms. Drudge left Ms. Bobet's office.  (Drudge Dep. at 89).  Ms. Bobet tried to contact the school resource officer throughout Wednesday evening but was unable to reach him, despite attempts to obtain a number for him from the associate superintendent and Dr. Meyers.  (Bobet Dep. at 81-82).  The next morning, Thursday, May 15th, Dr. Meyers made contact with the school resource officer, Chad Durham, who in turn contacted his investigative unit with KPD.  (See Drudge Dep. at 90-91).  Ms. Bobet summoned Ms. Drudge to the school, and the KPD officers who were there arranged for Ms. Bobet and Ms. Drudge to conduct a secretly-recorded interview of Mr. Rossillo that afternoon as part of the investigation of Mr. Rossillo. (Id. at 91-93, 98-99, 114-15).

The following week, arrest affidavits were presented to a state court judge, and arrest

warrants were issued for Mr. Rossillo on child abuse charges and for Dr. Meyers, Ms. Bobet, and Ms. Drudge on charges of failure to report child abuse in violation of section 39.205, Florida Statutes.  At that time, that section provided in pertinent part:  "A person who is required to report known or suspected child abuse, abandonment, or neglect and who knowingly and willfully fails to do so, or who knowingly and willfully prevents another person from doing so, is guilty of a misdemeanor of the first degree . . . ." § 39.205(1), Fla. Stat. (2002).   The mandatory child abuse reporting provision, section 39.201, at that time[7] provided:  "(1) Any person, including, but not limited to, any . . . [s]chool teacher or other school official or personnel . . . who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected by a parent, legal custodian, caregiver, or other person responsible for the child's welfare shall report such knowledge or suspicion to the department in the manner prescribed in subsection (2)."  Id. § 39.201(1).  Subsection (2) in turn provided that "[e]ach report of known or suspected child abuse, abandonment, or neglect pursuant to this section . . . shall be made *immediately* to the department's central abuse hotline on the single statewide toll-free telephone number, and, if the report is of an instance of known or suspected child abuse by a noncaretaker, the call shall be immediately electronically transferred to the appropriate county sheriff's office by the central abuse hotline."  Id. § 39.201(2)(a) (emphasis added).

      The arrest affidavits were prepared by the lead investigator on the case, Detective

---

[7]As noted later in this Order, some changes were made to section 39.201 effective June 10, 2003—after the arrest warrant was obtained in May 2003 but before the state attorney's office filed the information against Ms. Drudge on June 18, 2003.

Daniel Lockwood, whose supervisor was Sergeant Norman Lanphere, the remaining individual Defendant in this case.  Sergeant Lanphere reviewed the arrest affidavit regarding Ms. Drudge before it was presented to the judge for issuance of the warrant.

On Wednesday, May 21st, Mr. Rossillo was arrested at the media center to which he had been reassigned.  Ms. Drudge, Ms. Bobet, and Dr. Meyers were permitted to turn themselves in, and after being processed they were released on their own recognizance. By the time they were released, however, local news crews were at the jail with video cameras.  The case received significant coverage by the local television news.

On June 18, 2003, the state attorney's office filed an information charging Ms. Drudge with violating section 39.205, Florida Statutes.  (Candra Moore Dep. at 10, 21; Information, Def.'s Ex. A to Candra Moore Dep.).  Ms. Bobet and Dr. Meyers were also charged.  The case against Ms. Bobet was resolved via a "pretrial diversion"; she pled not guilty, performed forty hours of community service, and wrote three essays.  (Bobet Dep. at 110-11).  Dr. Meyers and Ms. Drudge moved to dismiss the charges against them, and their motions were granted on April 21, 2004.  (Order Granting Motions to Dismiss in criminal case [hereinafter "State Court Order"], Ex. E to Doc. 54).  In the State Court Order, a county judge agreed with the argument of Dr. Meyers and Ms. Drudge that sections 39.201 and 39.205, Florida Statutes, did not require reporting of known or suspected child abuse when the alleged perpetrator of the abuse is a public school teacher.  (See id.).[8]  This conclusion was based

_____

[8]Contrary to the allegations of the Complaint, the judge did *not* dismiss the charge on the basis that the statute "was unconstitutionally vague on its face."  (See Compl., Doc. 4, at 8 ¶ 34).

on the statutory language—including the definitions of certain terms provided in another section—and on legislative history.  (See id.).  The charges against Dr. Meyers and Ms. Drudge were then dismissed.  (Id. at 7).

Ms. Drudge's criminal record has been expunged at the school board's expense. (Drudge Dep. at 145).  As of her July 2007 deposition, Ms. Drudge remained employed as a School Relations Specialist with the Osceola County School Board.  (Id. at 7).  Mr. Rossillo was prosecuted on child abuse charges; ultimately, he entered a plea and received probation.  (DeYoung Dep. at 22).  The assistant state attorney assigned to the case felt that the case against Rossillo "was weakened by various factors," including the interviewing of the children by Ms. Drudge before the matter was reported to law enforcement.  (Id. at 22, 29).  The assistant state attorney explained that because the children were so young, they were confused about who told them things and what they had told others, and the chances of obtaining a conviction were slim due to the inconsistencies in the children's stories.  (Id. at 22-23, 33).

Ms. Drudge filed the instant lawsuit in early 2007.  She initially named as Defendants the City, Sergeant Lanphere, Detective Lockwood, and KPD Deputy Chief Klein.  However, she has voluntarily dismissed her claims against Detective Lockwood and Chief Klein.  (See Docs. 53 & 57).  In Counts I and II of her Complaint (Doc. 4), Ms. Drudge brings claims against both of the remaining Defendants pursuant to 42 U.S.C. § 1983 for violation of her constitutional rights.  She also brings several state law claims:  malicious prosecution (Count III) and intentional infliction of emotional distress (Count X) against Defendant Lanphere only; and false arrest (Counts VI and IX) against both Sergeant Lanphere and the City.

## II.  Discussion

### A.  Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations."  Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  "A nonmoving party[] opposing a motion for summary judgment supported by affidavits [or other relevant evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine.  That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the

-10-

nonmoving party."  Id. at 248.

### B.  The Merits of Defendants' Motions

As earlier noted, Ms. Drudge brings four counts against Sergeant Lanphere and two counts against the City.  These counts are:  § 1983 claims against both Sergeant Lanphere (Count I) and the City (Count II); false arrest claims against both Sergeant Lanphere (Count VI) and the City (Count IX); a malicious prosecution claim against Sergeant Lanphere (Count III); and a claim for intentional infliction of emotional distress against Sergeant Lanphere (Count X).  The counts are addressed in turn.

### 1.  § 1983 Claims (Counts I and II)

Section 1983 imposes civil liability on any person who, under color of state law, "subjects, or causes to be subjected" a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  It is well settled that this provision "'is not itself a source of substantive rights[]' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); accord Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) ("[Section] 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States.").  "The first step in any such claim is to identify the specific constitutional right allegedly infringed."  Albright, 510 U.S. at 271.

The alleged constitutional basis for Ms. Drudge's § 1983 claims varies a bit in the court filings and requires brief introductory discussion.  The first page of the Complaint states that "Counts I and II . . . are brought pursuant to [§ 1983] and the First, Fourth, Fifth[,] and

Fourteenth Amendments to the United States Constitution." (Doc. 4 ¶ 2). However, I have been unable to discern any cognizable claim under the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

In her § 1983 claim against Sergeant Lanphere (Count I), Ms. Drudge identifies the "rights under the United States Constitution" that Sergeant Lanphere allegedly violated as the rights to "freedom from a deprivation of liberty without due process of law" and "freedom from summary punishment." (Doc. 4 ¶ 37). She does not mention the Fourth Amendment in that claim, though in the "Concise Statement of the Nature of the Action" section of the Joint Pretrial Statement, only the Fourth Amendment is mentioned in the characterization of the § 1983 claims. (See Doc. 75 at 2). Later in the Pretrial Statement, Ms. Drudge again mentions, without elaboration, due process and equal protection. (See Doc. 75 at 9-10). In the § 1983 claim against the City (Count II), the Complaint alleges "a pattern and/or policy of unreasonable and illegal imprisonment by police officers" and improper procedures regarding the filing of probable cause affidavits. (Doc. 4 ¶¶ 40-45).

As far as I can determine, Ms. Drudge's § 1983 claims are appropriately characterized as arising under the Fourth Amendment, as they are based on her allegations that the warrant for her arrest was not based on probable cause. See U.S. Const. amend. IV (providing that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"); see also Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007) ("A plaintiff's allegations that police seized him 'pursuant to legal process that was not supported by probable cause and that the criminal proceedings terminated in his favor are sufficient to state a . . . claim alleging a seizure that was violative of the Fourth Amendment.'" (quoting Brooks v. City of Winston-Salem, 85 F.3d 178, 183-84 (4th Cir. 1996))) (alteration in original).  Defendants' motions for summary judgment couch the analysis in Fourth Amendment terms, and Ms. Drudge responded to them as such.  I have not been able to glean any other potential constitutional basis for her claims from the record, and thus I analyze the § 1983 claims as arising under the Fourth Amendment.[9]

   *a.  Count I – Sergeant Lanphere*

   Sergeant Lanphere contends that he is entitled to summary judgment on Count I based on qualified immunity.  "The defense of qualified immunity completely protects

---

[9]To the extent Ms. Drudge is attempting to raise due process or equal protection claims, such claims have not been adequately presented and in any event are without merit. "The Supreme Court has rejected the proposition that a defendant possesses a liberty interest in avoiding prosecution upon less than probable cause.  And, the Fourth Amendment provides all of the pretrial process that is constitutionally due to a defendant in order to detain him prior to trial." Brooks v. City of Winston-Salem, 85 F.3d 178, 184 (4th Cir. 1996) (citation omitted).  Moreover, there is no evidence that Ms. Drudge was deprived of her liberty for any length of time; upon learning of the arrest warrant, she reported to the jail and after being processed was released on her own recognizance.   I find no basis for a "summary punishment" claim. Cf. Underwood v. Pennsylvania, No. 05-3452, 2006 WL 1147263, at *4 n.1 (E.D. Pa. Apr. 26, 2006) ("A thorough review of the Complaint indicates that the allegations all relate to Plaintiff's arrest without probable cause, and the Court will therefore treat the allegation that Plaintiff was deprived of her 'freedom from summary punishment' as subsumed by the malicious prosecution claim under the Fourth Amendment.").

government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). "'[T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir. 1989) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)) (alterations in original).

"To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." Cottone v. Jenne, 326 F.3d 1352, 1357 (11th Cir. 2003). It is clear that Sergeant Lanphere was acting[10] within his discretionary authority during the events at issue in this case.[11] See, e.g., Horton v. Williams, No. 2:06cv526-MHT,

_____

[10]It is undisputed that Sergeant Lanphere did not draft the arrest affidavit at issue. Instead, he, reportedly upon direction from his own supervisors, directed Detective Lockwood to draft it; Sergeant Lanphere then reviewed it before it was presented to the judge. "It is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (citation and internal quotation omitted). Instead, "'supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.'" Id. (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)) (alteration in original); see also Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (noting that a causal connection can also be established "when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so'" (quoting Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003))). I assume without discussion that, construing the facts in the light most favorable to Ms. Drudge, Sergeant Lanphere was sufficiently involved in the events at issue to potentially be liable even though he was not the drafter of the arrest affidavit.

[11]Ms. Drudge does not dispute this point. (See Pl.'s Resp. to Def. Lanphere's Mot.

2008 WL 3918065, at *4 (M.D. Ala. Aug. 27, 2008) (noting that it was undisputed that investigator "was acting within his discretionary authority when he filed an affidavit in support of an arrest warrant that led to [the plaintiff's] arrest and prosecution"); cf. Herren v. Bower, 850 F.2d 1543, 1545 n.5 (11th Cir. 1988) (agreeing with district court's rejection of argument that sheriff was not performing discretionary function in case involving probable cause to arrest); Everton v. Willard, 468 So. 2d 936, 937 (Fla. 1985) (holding that "the decision of whether to enforce the law by making an arrest is a basic judgmental or discretionary governmental function").

"Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity" under the two-part test articulated in Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Cottone, 326 F.3d at 1358. Under the Saucier test, the Court "must first determine whether the plaintiff has shown that the challenged conduct violates a statutory or constitutional right." Rioux v. City of Atlanta, 520 F.3d 1269, 1282 (11th Cir. 2008). In making this assessment, the facts are viewed "in the light most favorable to the plaintiff." Id. "If no constitutional violation would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.

Ms. Drudge was arrested—or, more accurately, allowed to turn herself in—after an

---

for Summ. J., Doc. 52, at 11 (assuming without contesting that Sergeant Lanphere was engaged in a discretionary function)).

arrest warrant had been issued by a state court judge.[12]   Thus, this is not a case involving a warrantless arrest based on a determination of probable cause by a police officer out in the field.   Nevertheless, an arrest pursuant to a judicially-issued warrant may, like a warrantless arrest, amount to a Fourth Amendment violation by a police officer in certain circumstances.   In a case such as this one involving an arrest pursuant to a warrant, the matter of whether a constitutional violation has occurred turns on the contents of the affidavit that was presented in support of the arrest warrant.[13]   This is so because generally, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party."   Taylor v. Gregg, 36 F.3d 453, 456 (5th Cir. 1994).

The exception to this general rule is that "[a] magistrate's issuance of the warrant will not shield an officer when the warrant affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable,' nor will it shield an officer when the

---

[12]Such self-surrender pursuant to an arrest warrant qualifies as a Fourth Amendment seizure.  See Albright v. Oliver, 510 U.S. 266, 271 (1994) (noting that petitioner's surrender upon learning of warrant issued for his arrest "constituted a seizure for purposes of the Fourth Amendment").

[13]In her response memorandum, Ms. Drudge cites several cases regarding "[w]hen the facts relied on to show probable cause are in dispute."  (See Doc. 52 at 8).  However, this is not such a case; the facts relied on to show probable cause are set forth in the arrest affidavit.  See Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007) ("In this case, there can be no dispute as to what facts the defendants relied on to establish probable cause for the challenged arrest and searches; they are memorialized in warrant affidavits.  Thus, whether the affidavits, on their face, demonstrate probable cause[] is a question of law.").  It is clear what facts were relied upon, and the salient question is whether the alleged omissions from the affidavit would have made a difference.  As set forth in the text, I conclude as a matter of law that they would not have.

underlying affidavit includes deliberate and reckless misstatements and omissions." Miller v. Prince George's County, 475 F.3d 621, 632 (4th Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 345 (1986)); accord Mannoia v. Farrow, 476 F.3d 453, 458 (7th Cir. 2007) (explaining that where defendant was arrested pursuant to a facially valid warrant, detective could violate defendant's rights "only if a reasonably well-trained officer in [detective's] position should have known that the information he provided in support of the warrant would have failed to establish probable cause and that he should not have applied for the warrant in the first place").  To succeed on a claim that a "seizure was unreasonable because it followed from a warrant affidavit that was deficient because it was dishonest," a plaintiff must prove that the affiant "deliberately or with a 'reckless disregard for the truth' made material false statements in his affidavit or omitted from the affidavit 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading.'" Miller, 475 F.3d at 627 (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978), and United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990)) (citations omitted).

"With respect to omissions, 'reckless disregard' can be established by evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.'" Id. (quoting Beauchamp v. City of Noblesville, 320 F.3d 733, 743 (7th Cir. 2003)) (alteration in original).  "Moreover, in order to violate the Constitution, the false statements or omissions must be 'material,' that is, 'necessary to the [neutral and disinterested magistrate's] finding of probable cause.'" Id. at 628 (quoting Franks, 438 U.S. at 155-56) (alteration in original); see also Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997) (noting that negligent or insignificant omissions will not invalidate a warrant and that "even

intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause"); Stewart v. Donges, 915 F.2d 572, 583 (10th Cir. 1990) ("Franks does not extend to immaterial omissions.").   "To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause.'" Miller, 475 F.3d at 628 (quoting Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)); accord Stewart, 915 F.2d at 582 n.13 ("Whether the omitted statement was material is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.").

Ms. Drudge contends that several facts were omitted from her arrest affidavit that would have negated probable cause if they had been included.  First, she asserts that the affidavit did not disclose that she had assisted with the investigation of Mr. Rossillo by participating, at the request of the KPD officers, in a secretly-recorded interview of Mr. Rossillo on the afternoon of May 15th.  Ms. Drudge contends that such information was exculpatory, but I agree with Defendants that it was not because it does not negate any elements of the crime with which she was charged.

Second, Ms. Drudge contends that the arrest affidavit should have included the fact that she and Ms. Bobet had reported Mr. Rossillo's conduct to Deputy Harvey late in the afternoon on Wednesday, May 14th; the affidavit instead indicated only that the matter was

reported to KPD by Dr. Meyers on the following day, May 15th.[14]   (See Drudge Arrest Aff. at 3).   However, even if that information had been included in the affidavit, probable cause would not have been negated because the mandatory reporting provisions that Ms. Drudge was accused of violating required, as noted in the affidavit, that a report "be made *immediately*."   § 39.201(2)(a), Fla. Stat. (2002) (emphasis added).   In light of the undisputed evidence that Ms. Drudge had—or, at a minimum, reasonably would have been regarding as having—"reasonable cause to suspect" child abuse as soon as early in the afternoon of Tuesday, May 13th, the difference between late Wednesday afternoon and early Thursday morning is not significant in the "probable cause" calculus because of the statute's

---

[14]In her memorandum, Ms. Drudge seems to claim both that Sergeant Lanphere "did not learn until after the arrest of Drudge that she and Bobet had called Deputy Harvey to report the abuse allegations on the 14th" (Doc. 52 at 3) and that Sergeant Lanphere "failed to share with Chief Weimer . . . that she and Bobet had called Deputy Harvey of the Osceola County Sheriff's Office to report Rosillo on the day before they reported him to Kissimmee Police Department" (id. at 18).   In support of the former, Ms. Drudge cites a deposition of Sergeant Lanphere that was taken in the criminal case; however, that deposition is not in the record, which includes only the deposition of Lanphere that was taken in this civil case on October 23, 2007.   In the deposition that is on file, it seems apparent that Sergeant Lanphere *did* know prior to Ms. Drudge's arrest about the report to Harvey.   (See, e.g., Lanphere Dep. at 228 (stating that he would expect that Chief Weimer knew that Ms. Bobet had called Deputy Harvey on the 14th because Chief Weimer "was in the meetings"); id. at 166-67 (responding, when asked why he did not, upon reviewing Detective Lockwood's arrest affidavit, tell Detective Lockwood to add information about Ms. Bobet reporting the matter to Deputy Harvey, that he "felt that it was complete in form" and contained enough information as it was)).   The stronger position for Ms. Drudge's case would seem to be that Sergeant Lanphere did know of it and allowed it to be omitted from the arrest affidavit.   Even under that stronger position, however, probable cause still exists as discussed in the text. Therefore, it is not necessary to attempt to reconcile the seemingly disparate deposition testimony or Ms. Drudge's inconsistent positions regarding the extent of Sergeant Lanphere's knowledge.

"immediacy" requirement.[15]

Ms. Drudge further asserts that Sergeant Lanphere did not possess "one shred of evidence that [she] intentionally and willfully violated the statute." However, "no police officer can truly know another person's subjective intent," Jordan v. Mosley, 487 F.3d 1350, 1355 (11th Cir. 2007), and the probable cause standard does not require a police officer to be able to prove a person's intent before an arrest can be reasonable. Moreover, again, here the affidavit was presented to a neutral magistrate for the issuance of the warrant, and unless, inter alia, the issuance of the warrant was outside "the range of professional competence of a magistrate," the affiant is not liable. Malley v. Briggs, 475 U.S. 335, 346 n.9 (1986). On the intent issue, as with the other issues raised by Ms. Drudge, issuance of this warrant was not "outside the range of professional competence of the magistrate."

In addition to the challenges that Ms. Drudge makes with regard to the facts allegedly omitted from the arrest affidavit, she also contests the charge under the Florida statute in and of itself, contending that because the child abuse reporting statute did not—as determined by the county judge who dismissed the criminal charge against her in April 2004—apply to the abuse by Mr. Rossillo, as a matter of law probable cause for her arrest

---

[15]Ms. Drudge contends that "'[i]mmediate' . . . is not defined in the statute and is irrelevant[,] as the element required for violation of the statute is intent—not a poor choice of timing." (Doc. 52 at 23). However, this argument is not well-taken. Section 39.205(1) states that a person "who knowingly and willfully fails to [report] . . . is guilty of a misdemeanor in the first degree," and section 39.201 sets forth the reporting requirements, including that a report "be made immediately." There is no basis for Ms. Drudge's assertion that "immediate" is inconsequential in the statutory scheme. Cf. Barber v. State, 592 So. 2d 330, 335 (Fla. 2d DCA 1992) (rejecting argument that predecessor statutory section was overbroad on the basis that it required reporting of an incident of child abuse even if the incident had already been reported).

could not have existed in May 2003.  Ms. Drudge avers that Sergeant Lanphere, who, like

the other KPD officers involved, had never arrested anyone for failure to report child abuse,

should have known that public school teachers were not within the class of perpetrators

whose abuse was required to be reported under the statute and that the fact that he did not

know that evidences reckless disregard for her rights.  However, this argument is without

merit.

The state court judge who dismissed the criminal charge in April 2004 did so based

on his determination that section 39.201 did not require reporting of a public school teacher's

abuse.  At the time Ms. Drudge was charged, this section required reporting by "[a]ny person

who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or

neglected *by a parent, legal custodian, caregiver, or other person responsible for the child's*

*welfare*."  § 39.201(1), Fla. Stat. (2003) (emphasis added).   The judge surveyed the

definitions of these classes of perpetrators, contained in a different statutory provision,

section 39.01, and ruled them out one by one as potentially encompassing a public school

teacher.  The closest category[16] was "other person responsible for a child's welfare," which

at the time was defined as follows:

> "Other person responsible for a child's welfare" includes
> the child's legal guardian, legal custodian, or foster parent; *an*
> *employee of a private school, public or private child day care*
> *center*, residential home, institution, facility, or agency; or any

---

[16]A public school teacher is obviously not a "parent," and the statutory definition
confirmed this.  See § 39.01(49), Fla. Stat. (2003).  "Legal custodian" was defined as "the
person or entity in whom the legal right to custody is vested."  Id. § 39.01(33).  "Caregiver"
was defined as "the parent, legal custodian, adult household member, or other person
responsible for the child's welfare as defined in subsection (47)."  Id. § 39.01(10).

> other person legally responsible for the child's welfare in a residential setting; and also includes an adult sitter or relative entrusted with a child's care.  For the purpose of departmental investigative jurisdiction, this definition does not include law enforcement officers, or employees of municipal or county detention facilities or the Department of Corrections, while acting in an official capacity.

Id. § 39.01(47) (emphasis added).  The judge concluded that this section "is clear and unambiguous and does not include a public school teacher as a person whose known or suspected child abuse must be reported to the central hotline." (State Court Order at 4). The judge then concluded that even if the statute were ambiguous, applying principles of statutory construction, including *expressio unius est exclusio alterius*, "the specific inclusion of particular classes of persons (i.e., 'an employee of a private school') in the definition of 'other person responsible for a child's welfare' implies that the Legislature did not intend to include other classes of persons not mentioned."  (Id. at 5).

The judge went on to examine the legislative history of the statute and determined that public school teachers were intentionally excluded, noting "public" had been removed from the definition of "other person responsible for a child's welfare" in 1993.  (See id. at 5-6). Prior to 1993, the definition read "employee of a public or private school" rather than "employee of a private school, public or private child day care center" as it did in 2003.  (Id. at 5-6 (citing predecessor statute, § 415.503(12), Fla. Stat.)).[17]

---

[17]As noted in the text, the state court judge focused on the change in the definition of "other person responsible for a child's welfare" that was made in 1993.  Although this Court has not undertaken an exhaustive analysis of the legislative history, the 1993 change does not seem to be of the effect that the state court judge gave it.  This definition was changed at that time, but, because of the way other sections were written, reporting of a public school teacher's abuse was still required in 1993 even after the change.  The mandatory reporting

section in effect at that time, section 415.504(1), required that "[a]ny person . . . who knows, or has reasonable cause to suspect, that a child is an abused or neglected child shall report such knowledge or suspicion." § 415.504(1), Fla. Stat. (1993). The definition of "abused or neglected child" was "a child whose physical or mental health or welfare is harmed, or threatened with harm, by the acts or omissions of the parent or other person responsible for the child's welfare *or, for purposes of reporting requirements, by any person*." Id. § 415.503(1) (emphasis added). The last part of this definition would still require the reporting of a public school teacher's abuse, notwithstanding the removal of "employee of a public school" from the definition of "other person responsible for a child's welfare." In any event, however, between 1993 and 2003 the statutes were amended in such a way that the definitional scheme that was in effect in 2003 leads to the result reached by the state court judge; in other words, although the change in 1993 did not obviate the need to report abuse by a public school teacher, the statutes in effect in 2003 support the judge's definition-based conclusion.

On another note, the State Court Order cites to the 2003 version of the Chapter 39 sections at issue. That version includes several changes that were made in June 2003—the month after Ms. Drudge's arrest—that bear somewhat on this issue. The 2002 version of section 39.201 and 39.205, not the 2003 version, was in effect at the time of the issuance of the arrest warrant. Effective June 10, 2003, section 39.201 was amended to provide that "[a]ny person who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected by a parent, legal custodian, caregiver, or other person responsible for the child's welfare, *as defined in this chapter*, shall report . . . ." Id. § 39.201(1)(a) (2003) (emphasis added); see ch. 03-127, Laws of Fla. The state court judge relied in part on the italicized language. (See State Court Order at 3 ("The statute further limits its application to members of those listed groups 'as defined in this chapter.' Each class of potential abusers for whom reporting through the hotline is mandatory is defined in section 39.201.")). However, this language was not in the statute in May 2003 when the arrest warrant was sought and issued; it was approved by the Governor and filed in the office of the Secretary of State on June 10, 2003. See ch. 03-127, Laws of Fla.

Also in June 2003, language that the parties have referred to as listing "mandatory reporters" was removed. At the time of the issuance of the arrest warrant, section 39.201(1) provided in full:

> (1) Any person, including, but not limited to, any:
> (a) Physician, osteopathic physician, medical examiner, chiropractic physician, nurse, or hospital personnel engaged in the admission, examination, care, or treatment of persons;
> (b) Health or mental health professional other than one listed in paragraph (a);
> (c) Practitioner who relies solely on spiritual means for healing;
> (d) School teacher or other school official or personnel;

The fact that the state court judge dismissed the criminal charge against Ms. Drudge in April 2004 based on construction of the statute, however, does not mean that there was not probable cause for the arrest of Ms. Drudge in May 2003 or that a constitutional violation occurred when KPD officers requested an arrest warrant for the non-reporting of Mr.

---

> (e) Social worker, day care center worker, or other professional child care, foster care, residential, or institutional worker;
> (f) Law enforcement officer; or
> (g) Judge,
> who knows, or has reasonable cause to suspect, that a child is abused, abandoned, or neglected by a parent, legal custodian, caregiver, or other person responsible for the child's welfare shall report such knowledge or suspicion to the department in the manner prescribed in subsection (2).

§ 39.201(1), Fla. Stat. (2002).  Throughout this case and the events leading up to it, the parties, the lawyers, and virtually everyone involved have referred to school officials as among the "mandatory reporters" of abuse based on this language; however, I do not read this section's listing of occupations as qualifying the language "any person."  Instead, this subsection requires reporting by "any person," "including but not limited to" those listed.  The 2002 version of subparagraph 39.201(2)(c) provided that "[r]eporters in occupation categories designated in subsection (1) are required to provide their names to the hotline staff"; this name-providing requirement is the apparent reason for the listing of occupational categories, and the listing of the categories does not mean that only people in those occupations were required to report.  When the statute was amended effective June 10, 2003, the list of occupational categories was removed from the reporting section; the new version required "any person" to report without any potentially qualifying language.  Id. § 39.201(1)(a) (2003); see ch. 03-127, Laws of Fla.  A separate subsection then listed these occupational categories as those who must provide their names.  § 39.201(1)(b), Fla. Stat. (2003); see ch. 03-127, Laws of Fla.  Again, these clarifying changes were made after the arrest warrant was issued but before the state attorney's office filed the information in mid-June 2003.

In 2006, the definition of "other person responsible for a child's welfare" was changed again, removing the "private" limitation on "school"; that is, the 2006 version provides in pertinent part that the term "includes the child's legal guardian or foster parent; an employee of *any* school, public or private child day care center, residential home, institution, facility, or agency." § 39.01(46), Fla. Stat. (2006) (emphasis added).  This change was approved and filed on June 12, 2006.  See ch. 06-194, Laws of Fla.  The 2007 version reads the same way. § 39.01(46), Fla. Stat. (2007).

-24-

Rossillo's abuse.   "That a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself." Marx v. Gumbinner, 905 F.2d 1503, 1507 (11th Cir. 1990).   Probable cause "is 'judged by the facts and legal state of affairs that existed at the time of the arrest.'"   Fernander v. Bonis, 947 So. 2d 584, 588 (Fla. 4th DCA 2007) (quoting Mailly v. Jenne, 867 So. 2d 1250, 1251 (Fla. 4th DCA 2004)).

Courts have concluded that where a police officer reasonably but mistakenly construes a statute or ordinance in making an arrest, the arrest is not thereby rendered invalid.   For example, in Michigan v. DeFilippo, 443 U.S. 31, 33, 40 (1979), the Supreme Court held that "an arrest made in good-faith reliance on an ordinance, which at the time had not been declared unconstitutional, is valid regardless of a subsequent judicial determination of its unconstitutionality."   Although here the statute was not found unconstitutional by the state court judge,[18] for the purposes of determining whether a constitutional violation occurred, the issue is the reasonableness of the request for the arrest warrant.

In Mailly v. Jenne, a Florida appellate court affirmed the dismissal of claims against a sheriff for false arrest, finding that officers had probable cause to arrest for violation of a statute barring "lewdness."   867 So. 2d at 1252.   Citing DeFilippo, the court noted, "While this case does not involve an ordinance that has been held unconstitutional after an arrest, it does involve statutes where the elements of the crime have been the subject of discussion."   Id.   The Mailly court concluded that "[t]his is a case where the sheriff's proposed

---

[18]Again, this is so despite allegations to the contrary in the Complaint.   See n.8 supra.

statutory interpretation is at least 'arguable,' and not 'cockeyed.'" Id. (quoting Northen v. City of Chicago, 126 F.3d 1024, 1028 (7th Cir. 1997)).  This case is similar to Mailly;[19] the officers' interpretation was not "cockeyed," was certainly "arguable," and involved a statute that has been repeatedly amended and which was significantly clarified just one month after the events at issue.  In light of these factors, the request for a warrant was not unreasonable, and therefore no constitutional violation was committed by Sergeant Lanphere or other KPD officers in seeking the warrant.

The record and much of the parties' arguments pertain to the fact that Sergeant Lanphere, upon direction from his supervisors, consulted with the state attorney's office prior to instructing Detective Lockwood to prepare the arrest affidavit for Ms. Drudge.  The parties dispute what Sergeant Lanphere told the assistant state attorney and what the state attorney told Sergeant Lanphere about probable cause, but the state attorney testified in her deposition that Sergeant Lanphere asked to her to look at the statute and "make sure that they weren't missing something."  (DeYoung Dep. at 9).  The assistant state attorney, Ms. DeYoung, looked at the statute and told Sergeant Lanphere that she thought the school officials fell under it, apparently referring to the "who must report" portion of the statute rather than "who must be reported"; Ms. DeYoung "didn't think the statute had really much to do with Matthew Rossillo except he was the source of the abuse," and she did not study the statute with the purpose of trying to determine whether Mr. Rossillo was a person within the

---

[19]While DeFillippo and Mailly involved warrantless arrests, their holdings regarding the effect of unclear statutes apply with at least equal strength when an arrest pursuant to a judicially-issued arrest warrant is involved.

class of perpetrators the statute covered.  (Id. at 13, 16).

While the Court does not accord the same importance to the consultation with the state attorney's office as do the parties, the fact that the assistant state attorney did not notice anything in the statute that would render it inapplicable does provide additional support for the conclusion that a reasonable police officer would believe that an arrest warrant could appropriately be sought under this statute.  Law enforcement officers are not held to the same standard as lawyers in assessing statutes.  Cf. Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir. 2004) (finding, in § 1983 case involving warrantless arrest following discussion between police officer and prosecutor, that "[n]o Illinois prosecutor—a law-trained specialist in enforcement of the criminal law of Illinois—could reasonably believe that Kijonka had committed a crime" but that "[t]he situation with regard to [the police] officer . . . [was] different"; "[c]onsulting a prosecutor may not give an officer absolute immunity from being sued for false arrest . . . but it goes far to establish qualified immunity") (citations omitted); Barts v. Joyner, 865 F.2d 1187, 1193-94 (11th Cir. 1989) ("We cannot realistically expect that reasonable police officers know more than reasonable judges about the law.  Even if the state trial judge in [§ 1983 plaintiff's] criminal case was mistaken in denying the motion to suppress, if that judge's opinion about the fourth amendment's application to the events was within the range of professional competence (that is, was not an unacceptable error indicating 'gross incompetence or neglect of duty'), the police officer defendants ought not to be held liable." (quoting Malley, 475 U.S. at 346 n.9)).  Moreover, police officers certainly are not, despite some suggestion otherwise by Ms. Drudge, required or expected to research a statute's legislative history.

In sum, I conclude that the arrest affidavit was not factually deficient and that it was reasonable for KPD officers, including Sergeant Lanphere, to seek a warrant under this statute as a matter of law.  Although Sergeant Lanphere argues in his summary judgment motion that the statutory interpretation issue pertains to the "clearly established" prong of the <u>Saucier</u> qualified immunity test (<u>see</u> Doc. 41 at 15), my conclusion that Sergeant Lanphere is entitled to summary judgment is based on <u>Saucier</u>'s "violation of a constitutional right" prong.  As to the alleged factual deficiencies in the arrest affidavit, this point should be abundantly clear, but with regard to the legal aspect—the application of the Florida statute to Mr. Rossillo's abuse—the distinction is more subtle.

The issue of whether a constitutional violation occurred in this case hinges on the actions of Sergeant Lanphere and the other KPD officers, and, as noted earlier, boils down to the contents of the arrest affidavit and whether a reasonable officer would have believed it appropriate to present this affidavit to a judge to seek an arrest warrant.  The Florida statutory provisions are plainly listed in the affidavit, and the warrant was issued by the judge based on that affidavit.  As explained earlier in the text and footnotes of this Order, the statute has been repeatedly amended and was subject to varying but reasonable interpretations.  While this may mean that the *meaning of the statute* may not have been clear, it does not mean that the *constitutional right* at issue here—the right not to be unreasonably seized based on a warrant unsupported by probable cause—was not "clearly established"; certainly it was, though under well-established precedent I need not, having found no constitutional violation, proceed to this second <u>Saucier</u> step.  The fact that the statute was unclear bears on the issue of whether it was reasonable to seek the arrest

warrant.  Cf. Saucier, 533 U.S. at 206 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, [Supreme Court precedent] still operates to grant immunity for reasonable mistakes as to the legality of their actions.").  Because it was reasonable for a police officer to believe under the circumstances of this case that Ms. Drudge's actions fell within the terms of the statute, there was a reasonable basis upon which to seek the arrest warrant and thus there was no constitutional violation by the KPD officers.

Ms. Drudge was "seized . . . pursuant to legal process that was . . . supported by probable cause," Miller, 475 F.3d at 627 (internal quotation omitted), and thus, the seeking of the judicially-issued warrant did not violate the Fourth Amendment in this case.  Because there was no constitutional violation, Sergeant Lanphere is entitled to summary judgment on the § 1983 claim in Count I.[20]

---

[20]To the extent Ms. Drudge bases her § 1983 based on a malicious prosecution theory, the claim also fails.  The Eleventh Circuit "'has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983.'" Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir. 2008) (quoting Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003)).  "'[A]lthough both state law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law.'" Id. (quoting Wood, 323 F.3d at 882) (alteration in original).  "To establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation [of a federally protected right]." Fox v. Graff, No. 07-14720, 2008 WL 1946789, at *3 (11th Cir. May 6, 2008) (quoting Kingsland v. City of Miami, 382

*b. Count II – the City*

It is well-settled that a municipality cannot be liable under § 1983 for the acts of its employees based solely on the doctrine of respondeat superior.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  Of course, in light of my conclusion that no constitutional violation occurred in the instant case due to any act by a KPD officer, the issue of a basis for municipal liability need not be addressed, and the City is entitled to summary judgment on Count II.  Moreover, even if I had found a constitutional violation, there is no merit to Plaintiff's assertion that a City policy or practice led to any such violation.[21]

2.  State Law Claims (Counts III, VI, IX, and X)

*a. Sergeant Lanphere (Counts III, VI, and X)*

Sergeant Lanphere contends that he enjoys statutory immunity with regard to Ms.

―――――――――――――

F.3d 1220, 1234 (11th Cir. 2004)) (alteration in original).  "The common law tort of malicious prosecution includes the following six elements under Florida law:  (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.'"  Id. (quoting Kingsland, 382 F.3d at 1234).  Because an absence of probable cause is an element of a malicious prosecution claim, the probable cause discussion in the text disposes of this claim as well.  Additionally, of course, the Court has found no violation of a federally protected right, which is also necessary for a § 1983 malicious prosecution claim to succeed.

[21]Plaintiff contends in Count II that the City tolerated, ratified, or was deliberately indifferent "to a pattern and/or policy of unjustified and unreasonable and illegal imprisonment by police officers," "maintained an inadequate system of review of the filing of probable cause affidavits by police officers," and "maintained a system of grossly inadequate training pursuant to § 39.205 Fla. Stat. and the law of probable cause affidavits which failed to meet standard police training principles."  (Compl. ¶¶ 40-41, 43).

Drudge's state law claims.  He relies on section 768.28(9)(a), Florida Statutes, which provides:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28(9)(a), Fla. Stat. (2002).  Under this statute, governmental employees are clothed "with individual immunity that is lost only as to torts committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights and safety." Castellano v. Raynor, 725 So. 2d 1197, 1198 (Fla. 2d DCA 1999).  "Although the statute does not define 'bad faith,' under section 768.28(9)(a), '[b]ad faith has been equated with the actual malice standard.'"  Parker v. Fla. Bd. of Regents, 724 So. 2d 163, 167 (Fla. 1st DCA 1998) (quoting Ford v. Rowland, 562 So. 2d 731, 734 (Fla. 5th DCA 1990)) (alteration in original).

Sergeant Lanphere's assertion that he is entitled to immunity under this statute is well-taken.  Despite Ms. Drudge's assertions to the contrary, the instant record does not evidence actual malice on the part of Sergeant Lanphere.  The record evidence does not reveal any issue of material fact as to whether Sergeant Lanphere acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" as required for his immunity to be stripped.  Cf. Jordan v. Mosley, 487 F.3d 1350, 1357 (11th Cir. 2007) (finding, in Georgia case involving similar immunity statute, that

genuine issue of material fact remained on issue of whether officer acted with malice where the plaintiff "offered evidence tending to show that [the officer] caused [the plaintiff] to be arrested so that [the officer] could collect a civil debt" and the plaintiff testified that the officer demanded payment to teach her a lesson).  Indeed, I have concluded that there was a reasonable basis for presenting the arrest affidavit to a judge and that there were not material factual omissions from the affidavit.

Moreover, even if Sergeant Lanphere were not entitled to statutory immunity, the state law claims fail on their merits.  The false arrest claim fails on the facts of the case because the arrest was pursuant to judicially-issued legal process.  See, e.g., Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998) ("[A] claim for false arrest may be considered only when no arrest warrant has been obtained."); cf. Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007) (noting that where petitioner was detained without a warrant for his arrest, his detention was "without legal process").  Additionally, even if the circumstances of the case could give rise to a "false arrest" claim, probable cause bars such a claim as well as a malicious prosecution claim.  Finally, the claim for intentional infliction of emotional distress would fail on its merits because such a claim requires extreme and outrageous conduct.  Cf. Rapp v. Jews for Jesus, Inc., 944 So. 2d 460, 466 (Fla. 4th DCA 2006) ("To successfully state a cause of action for intentional infliction of emotional distress, the plaintiff must plead 'conduct so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" (quoting Allen v. Walker, 810 So. 2d 1090, 1091 (Fla. 4th DCA 2002))).  "'Whether alleged conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a

matter of law, not a question of fact.'"   Id. at 466-67 (quoting Gandy v. Trans World Computer Tech. Group, 787 So. 2d 116, 119 (Fla. 2d DCA 2001)).  There is no evidence supporting any such outrageous conduct in this case.

In sum, Sergeant Lanphere is entitled to summary judgment on the state law claims in Counts III, VI, and X based both on statutory immunity and on the merits of the claims.

   b.  The City (Count IX)

The only state-law claim that Ms. Drudge brings against the City is a false arrest claim in Count IX.  She alleges that such false arrest "resulted from willful and wanton conduct of Defendants, Norman Lanphere, Daniel Lockwood, and John Klein" and that the City is liable for such conduct under section 30.07, Florida Statutes.[22]  (Compl. ¶¶ 88-89).  However, this claim fails for several reasons.  First and foremost, of course, I have already determined that this is not a false arrest case because the arrest was pursuant to judicially-issued process.  Second, probable cause bars a claim for false arrest.  Finally, although a municipality is generally subject to respondeat superior liability under Florida law for the torts of its agents, see section 768.28(5), Florida Statutes (2002), a municipality "shall not be liable in tort for the acts or omissions of an officer, employee, or agent . . . committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights,

---

[22]This section, cited in the Complaint (see Doc. 4 ¶ 89), is not the correct section for municipal tort liability.  Section 30.07 pertains to deputy sheriffs and is not germane to this case, which involves city police officers.  (See § 30.07, Fla. Stat. (2002) ("Sheriffs may appoint deputies to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible.")).

safety, or property," id. § 768.28(9)(a).[23]  Inasmuch as Ms. Drudge has alleged as the sole

basis for this claim that the KPD officers committed false arrest through "willful and wanton"

conduct, the City could not be liable for false arrest in any event.[24]  For all of these reasons,

the City's motion for summary judgment on this claim must be granted.

## III. Conclusion

In sum, the record in this case does not support a finding of a violation of

constitutional or state law by the KPD officers.  Ms. Drudge should not, however, construe

this ruling as a finding by the Court that she acted improperly in connection with the events

of this case, that she "should" have been charged with a crime, or that most, if not all, people

in her shoes would not understandably be upset at being arrested and subjected to the

media coverage that the underlying case received.  It is clear that Ms. Drudge was

performing her job as an investigator and followed the instructions of her supervisors at all

pertinent times.  Moreover, of course, the statute under which she was charged ultimately

was found not to apply to the circumstances that Ms. Drudge faced.  However, not every

mistake by a police officer amounts to a constitutional violation or an actionable state law

claim, and this Court's only role has been to rule on those issues.

---

[23]Ms. Drudge did not respond to the City's argument regarding this provision barring liability for willful and wanton acts.  She merely asserted that the City "failed to argue on behalf of any of the officers besides Klein in its Motion for Summary Judgment with respect to the state tort claims."  (See Doc. 54 at 1).  However, the immunity statute applies to all employees, and all of them were alleged to have engaged in "willful and wanton conduct."

[24]It is not clear why the City did not move to dismiss this claim at the outset of the case; as pled, it clearly fails to state a claim for which relief can be granted.

In accordance with the foregoing, it is **ORDERED** that:

1.   Defendant Norman Lanphere's Motion for Summary Judgment (Doc. 41) is **GRANTED**.

2.   The Motion for Summary Judgment (Doc. 44) filed by Defendants City of Kissimmee and John Klein (Doc. 44) is **GRANTED** as to the claims against the City and **DENIED as moot** as to the claims against Defendant John Klein, who has already been dismissed from this case.

3.   All other pending motions are **DENIED as moot**.

4.   The Clerk is directed to enter a judgment in favor of Defendants in accordance with this Order.   Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 25th day of September, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record

-35-